**Liaison Counsel**

Kim E. Miller (SBN 178370)
KAHN GAUTHIER SWICK, LLC
12 E. 41st St., Ste. 1200
New York, New York 10017
Tel: (212) 696-3730
Fax: (504) 455-1498
E-mail: kim.miller@kgscounsel.com

Lewis S. Kahn (admitted *pro hac vice*)
KAHN GAUTHIER SWICK, LLC
650 Poydras St., Suite 2150
New Orleans, LA 70130
Tel: (504) 455-1400
Fax: (504) 455-1498
E-mail: lewis.kahn@kgscounsel.com

Elaine Byszewski  (SBN 222304)
HAGENS BERMAN SOBOL
SHAPIRO LLP
700 South Flower Street, Suite 2940
Los Angeles, CA 90017
Tel: (213) 330-7149
Fax: (213) 330-7152
Email: Elaine@hbsslaw.com

**Lead Counsel for Lead Plaintiff and the
Class**

**Liaison Counsel**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| In re: U.S. AUTO PARTS NETWORK, INC. SECURITIES LITIGATION | ) Master File No.: CV 07-2030-GW (JC)<br>)<br>) <u>CLASS ACTION</u><br>)<br>) **[AMENDED] DECLARATION OF**<br>) **KIM E. MILLER IN SUPPORT OF**<br>) **FINAL APPROVAL OF**<br>) **SETTLEMENT, PLAN OF**<br>) **ALLOCATION, AND THE**<br>) **AWARD OF ATTORNEY'S FEES**<br>) **AND EXPENSES**<br>)<br>)<br>)<br>) |

I, Kim E. Miller, declare:

1.     I am a partner at the law firm of Kahn Gauthier Swick, LLC (KGS) Lead Counsel for Lead Plaintiff in the above-captioned lawsuit ("Litigation").

2.     I submit this Declaration in support of final approval of settlement and the plan of allocation (collectively, "Settlement") and the application for award of attorneys' fees and reimbursement of expenses. The Stipulation, dated as of May 1, 2008 ("Stipulation")[1], provides for the payment of $10,000,000 million in cash. The Settlement resolves all claims asserted by Lead Plaintiff and the Class in this Litigation, brought against the following Defendants: U.S. Auto Parts Network, Inc. ("the Company"); Sol Khazani, Chairman of the Company's Board and co-founder of the Company during the relevant time period; Mehran Nia, President, CEO, and Director of the Company and a member of the Board of Directors during the relevant time period; Richard Pine, Vice President of Strategic Planning and Director for the Company during the relevant time period; Company board members Frederic W. Harman, Robert J. Matjeles, and Ellen F. Siminoff; and Michael J. McClane, CFO, Executive Vice President of Finance, and Treasurer of the Company during the relevant time period (collectively, "the Individual Defendants"); Oak Investment Partners XI, LP ("Other Controlling Defendant"); and RBC Capital Markets Corporation, Thomas Weisel Partners, LLC, Piper Jaffray & Co., and JMP Securities LLC (collectively, the    "Underwriter Defendants").

3.     This Declaration sets forth the nature of the claims asserted, the principal proceedings to date, the legal services provided by Lead Counsel, and the settlement negotiations; demonstrates why the Settlement is fair and in the best interests of the Class; and sets forth why the application for attorneys' fees and reimbursement of expenses is reasonable and should be approved by the Court.

---

[1]     This declaration incorporates by reference the definitions in the Stipulation, and all terms used herein shall have the same meanings set forth in the Stipulation.

[AMENDED] DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, AND THE AWARD OF ATTORNEY'S FEES AND EXPENSES

# I.   PRELIMINARY STATEMENT

4.   This case was vigorously litigated from its inception. Lead Counsel analyzed the Company's SEC filings, reviewed the Company's press releases, worked with a team of investigators and a forensic accounting consultant, and contacted former employees in order to ascertain the merits of the Litigation and to determine the relative strengths and weaknesses of the asserted claims. Lead Counsel prepared a detailed amended consolidated complaint, vigorously opposed Defendants' motion to dismiss, and engaged in extensive informal discovery while it was pending.

5.   On January 30, 2008, Lead Counsel and counsel for the Company and Individual Defendants as well as representatives for all layers of insurance attended mediation in Newport Beach, CA in front of Hon. Layn R. Phillips (Ret.). At that time, the parties reached an agreement in principle to settle for $10,000,000 cash, pending confirmatory discovery on the issues.

6.   In the course of confirmatory discovery, Lead Counsel developed a database that would allow it to categorize and organize the nearly 28,000 page of documents produced by defendants. Four attorneys carefully categorized and reviewed every document to assure the reasonableness of the settlement before the parties sought preliminary approval.

7.   Lead Counsel conducted an analysis of damages, consulting a damages expert regarding estimates of the number of class members, shares damaged, and total damages to the class. This included an analysis of Class recovery. The $10,000,000 settlement, seen in light of the highest possible estimated damages in this case, $40,400,000, represents a 24.8% recovery for the Class. Lead Counsel also engaged in ongoing communications with the Court-appointed Lead Plaintiff throughout the course of the litigation.

8.   The Settlement is the product of a wide-ranging investigation, aggressive litigation, and meaningful negotiation in consideration of the merits and risks

1   specific to this case.  Experienced counsel represented their respective parties with
2   full knowledge of the strengths and weaknesses of their respective clients' claims
3   and defenses.  The Settlement confers an immediate and substantial benefit to the
4   Class and eliminates the risk of continued litigation under circumstances where the
5   governing legal regime makes obtaining a favorable outcome difficult.   Lead
6   Counsel respectfully submit that under these circumstances the Settlement is in the
7   best interest of the Class and should be approved as fair, reasonable, and adequate.

8       9.      The Court should also approve the Plan of Allocation, award 25 percent
9   of the Settlement Fund, or $2,500,000 plus interest, as payment for attorneys' fees
10  to Lead Counsel for their efforts in creating a substantial benefit to the Class, and
11  award a separate reimbursement for litigation expenses in the amount of
12  $45,163.98.

13  **II.   SUMMARY OF PLAINTIFF'S ALLEGATIONS**

14      10.     Lead Plaintiff conducted an intensive investigation and filed the
15  Amended Consolidated Class Action Complaint for Violation of Federal Securities
16  Laws (the "Complaint") on October 4, 2007.  The Complaint asserts claims for
17  violations of §§11, 12 and 15 of the Securities Act on behalf of a class of all
18  purchasers of the publicly-traded securities of U.S. Auto between February 9, 2007
19  (the date of the Company's Initial Public Offering) and March 20, 2007, inclusive (
20  "Class Period").   As alleged in the Complaint, the Company failed to properly
21  integrate the recently-acquired ThePartsbin.com, Inc. ("Partsbin"), which used a
22  very different system to conduct business. ¶¶37-38.[2] The Company could not
23  assimilate Partsbin's drop-ship order fulfillment system or Partsbin's diverse
24  business culture and operations. ¶¶38-39.

25      11.     Furthermore, the Company failed to fill customer orders, to keep the
26  online catalogue information current, or to retain key employees from Partsbin's

27  _____

28  [2]    All references to ¶__ are to the Amended Consolidated Class Action Complaint for
Violations of Federal Securities Laws.

1   catalog department that were crucial to successfully integrating the two companies
2   and ensuring that the differing order fulfillment methods at the two companies
3   worked in harmony. Inventory, as contended in the Complaint, was often
4   unavailable or priced differently than advertised. ¶¶43-47. Partsbin sent customers
5   incomplete or incorrect orders to prevent the issuance of customer credits and
6   created obstacles to obtaining those credits.  Further, the Complaint alleges the
7   Company failed to maintain adequate staff to address customer complaints and
8   other issues, in spite of letters from the Better Business Bureau, complaints from
9   attorneys, and complaints from Attorneys General of various States. ¶64-71. The
10  extremely high volume of Partsbin customer complaints involving failure of
11  Partsbin to issue credits for returned or cancelled or wrong merchandise and the
12  lack of an adequate procedure or control mechanism at Partsbin to deal with and
13  adequately address the issues arising therefrom or any adequate control, were
14  omitted from the Prospectus. ¶¶69.

15      12.   Revenues were inflated as a result of customer cancellations for
16  improperly filled orders. The Company also failed to disclose substantial credit
17  risks associated with Partsbin's drop-ship order fulfillment system, under which
18  Partsbin was responsible for paying the third-party vendors, who shipped the
19  orders directly, whether or not the customer payment came through. ¶¶48-49.
20  Partsbin faced inventory risks because returned parts were sent directly to Partsbin,
21  and not to the vendors. Partsbin risked receiving thousands of dollars of returned
22  merchandise daily with no adequate control or ability to predict inventory return
23  levels. ¶¶50-58.

24      13.   U.S. Auto Parts further failed to disclose materially decreased profit
25  margins and revenues in the period leading up to the IPO, ¶¶59-60, material control
26  deficiencies which operated to prevent minimum standards of good corporate
27  governance or controls and procedures, as required by the SEC and the Company's
28  own internal guidelines and standards of business conduct. ¶¶61-63. And, at the

4

1    time of the IPO, Defendants had not conducted an adequate due diligence into the
2    Company or the recently-acquired Partsbin. ¶¶62.

3         14.    The Complaint further alleged that the Company suffered from numerous
4    GAAP and SEC regulation violations by failure to adequately disclose, despite
5    SEC requests that the Company do so, the issues regarding Partsbin integration, the
6    Company's revenue recognition policies, the Company's true return and credit
7    policies, and the Company's inventory and order fulfillment issues. ¶¶84-110. The
8    IPO failed to adequately disclose the internal control issues at the Company, which
9    prevented the Company from being able to assure strict compliance with its
10   internal guidelines for accounting, financial reporting and forecasting - including
11   its use of estimates. ¶¶111-114.

## III.  LEAD PLAINTIFF'S PROSECUTION OF THE CASE

### A.    Summary of Procedural History

15        15.    Prior to and throughout the course of the Litigation, Lead Plaintiff
16   conducted a thorough and wide-ranging investigation into the facts and
17   circumstances underlying U.S. Auto's alleged materially untrue and misleading
18   statements and omissions.  In connection with these efforts, among other things,
19   Lead Counsel: (a) analyzed public statements made or issued during the Class
20   Period, including financial statements; (b) collected and reviewed analyst reports
21   and major financial news service reports; and, (c) contacted former employees
22   knowledgeable of the factual circumstances underlying Lead Plaintiff's allegations.

23        16.    Two initial complaints were filed in this action on March 28, 2007 in the
24   United States District Court for the Central District of California. On May 15,
25   2007, the Court consolidated the two cases as *In re U.S. Auto Parts Network, Inc.,*
26   2:07-cv-02030.

27        17.    Lead Plaintiff and competing movants filed motions for lead plaintiff on
28   May 29, 2007.  The parties filed oppositions to these motions on July 9, 2007 and
     reply memorandums were filed on July 16, 2007.

18.     On July 23, 2007, the parties attended a motion hearing before Judge Wu on the motions to be appointed lead plaintiff. The Court heard oral argument on the motions and requested that plaintiffs' submit further briefing.

19.     On July 30, 2007 the parties submitted supplemental briefing pursuant to the Court's July 23 Order and the Court held another motion hearing on the matter on August 9, 2007.

20.     On August 16, 2007, the parties attended a telephonic status conference and the Court appointed Sasco Investments, LP as Lead Plaintiff pursuant to §21D(a)(3)(B) of the Securities Act of 1933 (the "Securities Act"), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), and approved its selection of Kahn Gauthier Swick, LLC as Lead Counsel in the consolidated action (the "Litigation"), and Hagens Berman Sobol Shapiro, LLP as liaison counsel.

21.     On September 5, 2007, a competing lead plaintiff movant that was not appointed moved to intervene pursuant to Federal Rule of Civil Procedure 24. On September 24, 2007, Lead Plaintiff filed a non-opposition to the motion to intervene. On September 25, 2007, the motion to intervene was withdrawn.

22.     In anticipation of filing a consolidated amended pleading, Lead Plaintiff conducted an intensive investigation and filed the operative complaint in the Litigation, the Amended Consolidated Class Action Complaint for Violation of Federal Securities Laws (the "Complaint"), on October 4, 2007.

23.     The Complaint included allegations that, in violation of Section 11: 1) the Company had failed to properly integrate the recently-acquired ThePartsbin.com, Inc. ("Partsbin"), 2) the Company was unable or failed to fill customer orders, to keep the online catalogue information current, or to retain key employees from Partsbin's catalog department that were crucial to successfully integrating the two companies, 3) revenues were inflated as a result of customer cancellations for improperly filled orders, 4) the Company failed to disclose

1   substantial credit risks associated with Partsbin's drop-ship order fulfillment

2   system, 5) Partsbin had undisclosed credit programs which inflated revenue

3   reporting, 6) the Company failed to disclose materially decreased profit margins

4   and revenues in the period leading up to the IPO, 7) at the time of the IPO,

5   Defendants had not conducted an adequate due diligence into the Company or the

6   recently-acquired Partsbin, 8) the Company made material misstatements as to its

7   business plan, growth strategy, and the state of the integration of Partsbin, 9) the

8   IPO registration statement contained untrue statements about the Company's order

9   fulfillment system, available inventory, and reserve for returns, 10) the Company

10  failed to maintain adequate technology and management systems, contrary to

11  statements in the Registration Statement, 11) the Company suffered from

12  numerous GAAP and SEC regulation violations, and 12) the registration statement

13  failed to adequately disclose the internal control issues at the Company.

14      24.    On October 1, 2007, parties attended a status conference at which the

15  Court set the dates for filing an amended complaint and the subsequent response

16  and/or motions.

17      25.    On October 31, 2007, Defendants moved to dismiss the Complaint in its

18  entirety for failure to state a claim upon which relief can be granted pursuant to

19  Rule 12(b)(6).   Lead Plaintiff filed an opposition to the motion to dismiss on

20  November 27, 2007.  A reply memorandum was filed on December 13, 2007.

21      26.    In the motions to dismiss, Defendants pressed numerous arguments

22  aimed at a complete dismissal including that the Complaint sounded in fraud and

23  yet failed to comply with the particularity requirements of Rule 9(B); that

24  Registration Statement's risk factors were sufficient to warn investors; that US

25  Auto did not omit the alleged truth because the Registration Statement disclosed

26  expenses associated with the acquisition of Partsbin as well as that such expenses

27  would continue in the near future; that there was no relation between the alleged

28  disclosure and investors' losses; and that there were insufficient allegations of

1  control against Defendant Oak Investment Partners to meet Section 15 control
2  person liability.

3      27.    Lead Plaintiff's opposition vigorously refuted these contentions. In its
4  opposition, Lead Plaintiff argued that Sections 11, 12, and 15 do not require
5  pleading of intent to defraud and that this case sounded only in negligence,
6  subjecting it to a liberal Rule 8 pleading standard. In the alternative, Lead Plaintiff
7  argued that Plaintiff's claims were plead with particularity because the Complaint
8  alleged the particular misconduct and an explanation as to why the Defendants'
9  statements and omissions were false and misleading. Lead Plaintiff reiterated its
10 allegations that US Auto Parts failed to perform due diligence into its newly
11 acquired Partsbin and as a result misled investors about the two companies'
12 integration and the Company's internal controls and procedures. The opposition
13 reiterated that the Company's statements about its rapid and accurate fulfillment of
14 orders, technical competencies, and high profit margins were misleading because
15 of US Auto's undisclosed credit and return programs which inflated profits.
16 Regarding control person liability, Lead Plaintiff argued that Oak Investment
17 Partner's ownership of 22% of the Company stock, ability to appoint at least two
18 directors to the Board, and the fact that signature the controller of Oak Investment
19 Partners' was also a U.S. Auto Board member were sufficient to show control.

20     28.    The parties had fully prepared to argue the motions to dismiss at a
21 hearing scheduled for February 4, 2008 but this was continued by stipulation until
22 April 7, 2008 and again continued until May 12, 2008 as a result of favorable
23 settlement negotiations and to allow time for confirmatory discovery.

24     29.    In late 2007, Defendants contacted Lead Counsel and the parties agreed
25 to mediate. The parties reached a compromise agreement at mediation on January
26 30, 2008, before the Court issued a decision on the motions to dismiss. At that
27 time, the parties reached an agreement to settle for $10,000,000 in cash. The
28 parties entered into a Stipulation of Settlement dated as of May 1, 2008 and on that

1  day, the parties filed a joint motion for preliminary approval of class action

2  settlement.

3  **B.     Settlement Negotiations**

4  30.    Having fully comprehended the inherent strengths and weaknesses of

5  their case, the parties attended mediation on January 30, 2008.

6  31.    Throughout the course of these negotiations, all parties were represented

7  by counsel with considerable experience in securities class action suits.  There can

8  be no question that the Settlement was the result of an adversarial process.

9  32.    Lead Counsel identified the issues critical to the outcome of this case,

10  risks associated with continuing the litigation, likelihood of obtaining strong

11  evidence in support of the claims, defeating summary judgment after deposition

12  discovery, and, if successful on the motion for summary judgment, the substantial

13  risk, expense, and length of time to prosecute the Litigation through trial and the

14  inevitable subsequent appeals.  Lead Counsel has also considered the substantial

15  monetary benefit provided by the Settlement in light of all attendant risks,

16  including that of obtaining absolutely no recovery for the Class.

17  33.    Lead Counsel also considered the Settlement in light of very real

18  economic realities, most significantly the risk that even if Lead Plaintiff were to

19  successfully litigate the action to verdict, a judgment in excess of the amount of the

20  Settlement might force U.S. Auto Parts into bankruptcy or obstruct any purported

21  mergers; and the Class might recover even less than the amount negotiated or not

22  recover at all.

23  34.    Lead Counsel is actively engaged in a number of complex federal civil

24  lawsuits, particularly the litigation of securities class actions.  We believe that our

25  firm's attorneys' reputations for being unafraid to zealously carry a meritorious

26  case through trial and potential appeals worked to the benefit of the Class and gave

27  us a strong bargaining position to engage in meaningful settlement negotiations

28  with Defendants, even under the difficult and challenging circumstances presented

1    here.

2        35.    After negotiations concerning the final terms of the Settlement, the

3    parties executed the Stipulation and submitted it to the Court for preliminary

4    approval on May 1, 2008.  Lead Counsel respectfully submits that the Settlement

5    represents a very good result for the Class under the circumstances.   The

6    Settlement will provide members of the Class with a benefit without the very real

7    risk of no recovery if the Litigation were to continue.

8        36.    At a June 2, 2008 preliminary approval hearing, the Court ordered

9    numerous substantive and organizational changes to the Preliminary Approval

10   Order, Notice of Pendency, and Summary Notice. Among other changes, the Court

11   ordered that Lead Plaintiff be identified more fully, that the documents provide for

12   Counsel to receive and review objections before filing them with the Court, that

13   the requirement that Class Members notify the Court in advance of their intention

14   to appear at the Final Fairness Hearing be eliminated, and that the summary of the

15   claims process and the Plan of Allocation be clarified.

16       37.    On June 10, 2008, the Court held a telephonic conference reviewing the

17   changes made and ordering additional changes regarding the Plan of Allocation,

18   among other changes, and the court requested that a revised proposed order be

19   submitted by the following day.

20       38.    Counsel made all changes ordered by the Court and re-submitted the

21   documents on June 11, 2008. On June 13, 2008 the Court held another telephonic

22   conference ordering final changes. Counsel made all changes ordered and re-

23   submitted the documents the same day; the Court issued the order preliminarily

24   approving the Settlement and providing for Notice on June 13 after the changes

25   were received.

26       39.    Lead Counsel also engaged in a detailed discovery process to review the

27   documents produced by Defendants, in order to confirm the fairness and adequacy

28   of the settlement in this Action. Specifically, throughout the production process

and continuing after Defendants had produced nearly 28,000 pages of documents, Lead Counsel collaborated with their technology consultants to create a database which would allow for detailed review of all documents. Two Access databases were created, one for PDF documents produced (primarily emails) and one for Excel spreadsheets produced (which were attachments to the emails). Lead Counsel compiled a list of issues and persons who were key to plaintiffs' claims, and a coding system was developed so that each document reviewed would be identified in the database by which issues and people it addressed.

40.    Each document was given a separate entry in the databases, and documents were "coded" in their records: by beginning and ending bates number; by the date of the document; and as being relevant, irrelevant, or key to plaintiffs' claims. Email PDFs were identified by who sent them and who they were sent to, as well as by who was copied in the email. A summary of each email and PDF's data was entered, and a note was made as to which company the document related to (the Company or the acquired Partsbin). Each document record also contained a field for identification of key language appearing in the document. The Excel and PDF document records were cross-referenced such that each record identified parent and child attachment relationships. Each document record also contained a list of 10 identified issues and more than 20 identified persons, and document reviewers could choose one or multiple of these issues and names, and could also enter issues and names not appearing on the lists. A centralized database access was created so that multiple attorneys could review documents simultaneously, for efficiency purposes, and the documents were divided amongst the group of reviewing attorneys to prevent duplicative work.

41.    A team of four attorneys carefully reviewed each of the 28,000 pages of documents produced and each document was entered into the database. The database was designed with a versatile reporting function, and after the documents had been thoroughly reviewed, the information of key documents was centralized.

Furthermore, each attorney drafted detailed memoranda regarding the documents they had reviewed, analyzing the strengths and weaknesses of the case as shown in the discovery.

### C. Preliminary Approval of Settlement and Mailing of Publication of Notice of Settlement

42.     The preliminary approval hearing for the Settlement was held on June 2, 2008.  Thereafter, the Court preliminarily approved the terms of the Settlement on June 13, 2008 and directed that the Claims Administrator, Complete Claims Solutions, LLC, cause the mailing of the Notice of Pendency of Class Action and Proposed Settlement and the Proof of Claim and Release form to all potential Class Members identifiable with reasonable effort ("Preliminary Approval Order").

43.     The Court's Preliminary Approval Order also directed Lead Counsel to cause the notice for publication ("Notice") to be published once in the *Investor's Business Daily* and issued electronically over a widely disseminated media wire service.

44.     Submitted herewith is the Declaration of the Claims Administrator, which attests that Notice has been mailed to 3,922 potential Class Members, attesting to the printing of the Notice in the *Investor's Business Daily* on July 1, 2008, as well as dissemination of the Notice over *PR Newswire* on July 1, 2008 and September 2, 2008.

45.     The Notice, *inter alia*, informed Class Members of the terms of the Settlement and that Lead Counsel would seek an award of attorneys' fees in an amount no greater than one-third (33⅓ percent) of the Settlement Fund and reimbursement of expenses incurred in connection with the prosecution of this Litigation, not to exceed $80,000.

46.     The Notice also provided that any objections to the Settlement or the application for attorneys' fees and reimbursement of expenses had to be filed by August 27, 2008.  That date has now passed and, to the knowledge of Lead

12

1  Counsel, no objections have been filed to the Settlement or application for
2  attorneys' fees and expenses.

3  **IV.  FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT**

4      **A.      The Settlement Was Fairly and Aggressively Negotiated by Counsel**

5      47.    The terms of the Settlement were negotiated by the parties at arms'
6  length through adversarial, but good faith, negotiations to produce a Settlement
7  that is fair, reasonable, and adequate. The Settlement was the product of a process
8  involving Lead Counsel and counsel for Defendants. All counsel have extensive
9  experience in securities litigation in general, and securities class actions in
10  particular.

11      **B.      Serious Questions of Law and Fact Placed the Outcome of the
12               Class Action in Significant Doubt**

13      48.    Another factor considered in assessing the merits of class action
14  settlements—whether serious questions of law and fact exist—supports the
15  conclusion that the Settlement is fair, reasonable, and adequate to the Class.  As in
16  every complex securities law case of this kind, Lead Plaintiff and the Class faced
17  significant obstacles to recovery, both with respect to liability and damages. While
18  Lead Plaintiff and his counsel believe that the allegations have substantial merit,
19  Defendants have always denied liability and asserted that they possessed absolute
20  defenses to Lead Plaintiff's claims.

21      49.    During the course of this Litigation, Lead Plaintiff developed significant
22  evidence in support of the allegations. At the same time, however, such significant
23  hurdles exist that prevailing at trial would be very difficult. Some of the more
24  significant issues confronting Lead Plaintiff included:

25          a.  Whether the Complaint "sounded in fraud" and if so,
26              whether it could pass muster under the pleading
                requirements of the Private Securities Litigation Reform Act
27              and Fed. R. Civ. Proc. 9(b);

28          b.  whether the statements alleged by the Lead Plaintiff were

material, untrue and/or misleading when made;

   c.  the extent (if any) that various facts alleged by the Lead Plaintiff influenced the trading prices of U.S. Auto securities during the relevant period; and

   d.  the method for determining whether U.S. Auto securities were artificially inflated during the relevant period, the amount (if any) of such inflation; and the amount of damages (if any) that could be recovered at trial;

50.   Lead Plaintiff vigorously opposed Defendants' contentions, and cited ample authority supporting Lead Plaintiff's positions.

## V. THE PLAN OF ALLOCATION

51.   As set forth in the Notice, all Class Members who wish to participate in the distribution of the Settlement Fund must have submitted a proper Proof of Claim form. As provided in the Stipulation, after deducting all appropriate taxes, administrative costs, attorneys' fees, and reimbursement of expenses, the Settlement Fund will be distributed according to the Plan of Allocation.

52.   If approved, the Plan of Allocation will govern how the proceeds of the Settlement Fund will be distributed among Class Members who submit valid Proof of Claim forms.

53.   The proposed Plan of Allocation provides:

The Ten Million Dollar ($10,000,000) Cash Settlement amount and the interest earned thereon shall be the Gross Settlement Fund. The Gross Settlement Fund, less all taxes, approved costs, fees and expenses (the "Net Settlement Fund") shall be distributed to members of the Class who submit acceptable Proofs of Claim ("Authorized Claimants").

The Claims Administrator shall determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's "Recognized Claim." The Recognized Claim formula is not intended to be an estimate of the amount of what a Class Member might have been able to recover after a trial; nor is it an estimate of the amount that will be paid to Authorized Claimants

pursuant to the settlement. The Recognized Claim formula is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants.

The following proposed Plan of Allocation reflects the Complaint's allegations that Defendants made materially untrue and misleading statements and omissions in the Registration Statement and Prospectus in connection with the Company's February 9, 2007 IPO, resulting in violations of Sections 11, 12 and 15 of the Securities Act of 1933. The alleged untrue statements and omissions concern some of the following issues: the Company's failure to integrate ThePartsbin.com Inc., problems with correct and timely order fulfillment, materially decreased profit margins and revenues, control deficiencies, failure to maintain adequate staff, problems with technology and management systems, and Generally Accepted Accounting Principles and Securities Exchange Commission rule compliance. The Complaint alleges that these misrepresentations resulted in the artificial inflation of the prices of the Company's publicly-traded common stock during the Class Period from February 9, 2007 to March 20, 2007. Defendants deny that they did anything wrong.

Each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's recognized loss bears to the total of the recognized loss of all Authorized Claimants.

Shares eligible to claim are those shares of US Auto common stock purchased between February 9, 2007 and March 20, 2007 and held as of March 20, 2007.

54.    An Authorized Claimant's Recognized Claim will be calculated as follows:

1.    There were 11.5 million shares issued in the IPO of February 9, 2007. If all shares claim, the average per share benefit is $.869.

2.    Shares eligible to claim are those shares purchased between February 9, 2007 and March 20, 2007, and still held at the close of trading on March 20, 2007. Shares purchased after March 20, 2007, are not eligible to claim.

[AMENDED] DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, AND THE AWARD OF ATTORNEY'S FEES AND EXPENSES

3.     The recognized loss per share for shares eligible to claim is the lesser of:

(i)     The price paid less $5.39;

(ii)     $4.61;

(iii)     $10.00 less the price received; or

(iv)     If sold prior to final judgment, the price paid less the price received.

In the event a Class Member has more than one purchase or sale of Company common stock, all purchases and sales shall be matched on a First In First Out ("FIFO") basis. Class Period sales will be matched first against any Company shares held at the beginning of the Class Period and then against purchases in chronological order. A purchase or sale of Company common stock shall be deemed to have occurred on the "contract" or "trade" date as opposed to the "settlement" or "payment" date. The receipt or grant by gift, devise or operation of law of Company common stock during the Class Period shall not be deemed a purchase or sale of Company common stock for the calculation of an Authorized Claimant's Recognized Claim nor shall it be deemed an assignment of any claim relating to the purchase of such shares unless specifically provided in the instrument of gift or assignment. The receipt of Company common stock during the Class Period in exchange for securities of any other corporation or entity shall not be deemed a purchase or sale of Company common stock.

To the extent a Claimant had a gain from his, her or its overall transactions in Company common stock during the Class Period, the value of the Recognized Claim will be zero. To the extent that a Claimant suffered an overall loss on his, her or its overall transactions in Company common stock during the Class Period, but that loss was less than the Recognized Claim calculated above, then the Recognized Claim shall be limited to the amount of the actual loss.

The following defined terms shall be used to describe the process the Claims Administrator shall use to determine whether a Claimant had a gain or suffered a loss in overall transactions in Company common stock during the Class Period: The "Total Purchase Amount" is the total amount paid by the Claimant for all Company common stock

16

purchased during the Class Period less commissions and fees; the "Sales Proceeds" means the amount received for sales of shares of Company common stock sold by the Claimant during the Class Period less commissions and fees; and "Holding Value" means the monetary value assigned to the shares of Company common stock purchased by the Claimant during the Class Period and still held by the Claimant at the end of the Class Period. Here, if shares are held at the time of final judgment, the per-share Holding Value is the price paid less $5.39 (the closing price on March 28, 2007, the day the suit was brought). If shares are held at the end of the Class Period but sold prior to final judgment, the per-share Holding Value is the lesser of: (i) the price paid less $5.39; and, (ii) the price paid less the price received.

The difference between the Total Purchase Amount and the sum of Sales Proceeds and Holding Value will be deemed a Claimant's gain or loss on his, her, or its overall transactions in Company common stock during the Class Period.

Each Authorized Claimant shall be allocated a *pro rata* share of the Net Settlement Fund based on his, her or its Recognized Claim as compared to the total Recognized Claims of all Authorized Claimants.

55.    The proposed Plan of Allocation was formulated in order to calculate a fair method to divide the Net Settlement Fund for distribution among Class Members. Thus, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of the Settlement among Class Members.

## VI.  FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD

56.    The amount that Lead Counsel requests as attorneys' fees is limited to 25% of the Settlement Fund (plus interest).  It is respectfully submitted that such a fee is fair and reasonable and reflects a market-rate fee as contemplated under the PSLRA's provisions for selection of Lead Plaintiff and Lead Counsel.

57.    As set forth in the Memorandum of Law in Support of the Application for an Award of Attorneys' Fees and Reimbursement of Expenses, Lead Counsel

requests 25% of the Settlement Fund, or $2,500,000, plus interest, as payment for attorneys' fees, and no more than $45,163.98 in reimbursement of litigation expenses incurred in connection with the prosecution of this Litigation. The Notice informed Class Members that Lead Counsel would seek up to 33 $^1/_3$ % as a fee. While the attorney fee request is in fact substantially lower than that maximum set forth in the notice (by 8 $^1/_3$ %), no objection whatsoever was made to the attorney fee request and the Class appears to agree the result is a very good one for the Class. Furthermore, a lodestar cross-check shows that the requested fee award represents a multiplier of 2.41 when compared with Counsel's $1,038,427.85 total lodestar in this case, rendering the requested fee amount reasonable.

58.     Lead Counsel achieved a very favorable result for the Class at great risk and substantial expense to themselves. They were unwavering in their dedication to the interests of the Class and their investment of the time and resources necessary to bring this Litigation to a successful conclusion. The requested fee is reasonable based on the quality of Lead Counsel's work and the substantial benefit obtained for Class Members.

59.     Lead Counsel's compensation for the services rendered is wholly contingent. The expenses incurred in the prosecution of the Litigation are set forth in the accompanying affidavits from Lead Counsel, which are submitted herewith. Lead Counsel, in seeking reimbursement of expenses, aver that the expenses are reflected in the books and records maintained by their respective firms and are an accurate recording of the expenses incurred.    In total, according to those accounting records, Lead Counsel have incurred reimbursable expenses in the amount of $45,163.98.  Included in this amount are the fees paid to the consultants who provided Lead Plaintiff with extensive assistance during this Litigation.  Lead Plaintiff respectfully submits that all of these expenses are reasonable and were necessarily incurred in connection with the prosecution of this Litigation.

**A.     Time and Labor Expended by Counsel**

[AMENDED] DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, AND THE AWARD OF ATTORNEY'S FEES AND EXPENSES

60.   Lead Counsel achieved this very favorable result for the Class at great risk and substantial expense to themselves. They were unwavering in their dedication to the interests of the Class and their investment of the time and resources necessary to bring this Litigation to a successful conclusion. The requested fee is reasonable based on the quality of Lead Counsel's work and the substantial benefit obtained for Class Members.

61.   Lead Counsel's compensation for the services rendered is wholly contingent. The expenses incurred in the prosecution of the Litigation are set forth in the accompanying affidavits from Lead Counsel, which are submitted herewith. Lead Counsel, in seeking reimbursement of expenses, have averred that the expenses are reflected in the books and records maintained by the firms and are an accurate recording of the expenses incurred. In total, according to those accounting records, Lead Counsel have incurred reimbursable expenses in the amount of $45,163.98. Included in this amount are the fees paid to the consultants who provided Plaintiff with extensive assistance during this Litigation. Plaintiff respectfully submits that all of these expenses are reasonable and were necessarily incurred in connection with the prosecution of this Litigation.

### B.   Extent of Litigation

62.   As described above, this case was settled only after Lead Counsel conducted an extensive investigation – with the help of a top-notch private investigation firm and forensic accounting consultant – into the claims asserted, thoroughly researched the facts and law applicable to the claims and Defendants' defenses, prepared a fact-specific and detailed Complaint specifying Defendants' alleged violations of the federal securities laws, met with damages consultants, considered the risks of continued litigation, engaged in extensive settlement negotiations, and conducted confirmatory discovery, resulting in a beneficial settlement for the Class.

### C.   The Risks of Litigation and the Need to Ensure the Availability

**of Competent Counsel in High-Risk Contingent Securities Cases**

63.    This Litigation was undertaken by Lead Counsel on a wholly-contingent basis. From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to assure that sufficient attorney resources were dedicated to the prosecution of the Litigation and funds were made available to compensate staff and to pay for the considerable out-of-pocket costs which a case such as this entails. In addition to advancing litigation expenses and paying overhead, Lead Counsel faced the possibility of no recovery.

64.    Because of the nature of a contingent practice where cases are predominantly "big cases" lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also must advance the expenses of the litigation. The financial burden on counsel working on a contingent fee retainer is far greater than on a firm that is paid on a current and ongoing basis.

65.    Lead Counsel undertook to act for Lead Plaintiff in this matter aware that they would be compensated only by obtaining a successful result. The benefits conferred on Lead Plaintiff and the Class by this settlement are particularly noteworthy in that a Settlement Fund worth $10,000,000 was obtained for the Class.

**D.    Complexity of the Litigation**

66.    Lead Counsel drafted a detailed amended complaint, opposed Defendants' motion to dismiss, conducted significant discovery, and obtained a very good recovery for the Class. If Lead Counsel had not negotiated this Settlement, this complex securities action, involving numerous complex legal and factual issues, would require further voluminous document and deposition discovery. To prevail at trial, Plaintiff would necessarily have to convince the jury

1  that the Company's Registration Statement contained materially untrue and/or
2  misleading statements and omissions and overcome affirmative defenses from
3  Defendants, including a vigorous loss causation defense.

4       67.    Assuming the Action survived any motion for summary judgment, trial
5  preparation, followed by the trial itself, would have required many additional hours
6  of work and significant judicial resources, with the appearances of experts and the
7  introduction of voluminous documentary and deposition evidence, vigorously
8  contested motions, and the considerable expenditures of judicial resources. The
9  "normal" cost of litigation, including copying, travel, depositions, computer
10 support services, and other necessary expenses, would also be quite high. Here,
11 however, Lead Counsel were able to obtain a settlement of $10 million without
12 exposing the Class to the continued risk and the additional costs of further
13 litigation.

14       **E.    Standing and Expertise of Lead Counsel**

15       68.    The expertise and experience of Lead Counsel is described in the
16 declarations of counsel submitted herewith, attaching the firm's biography. Lead
17 Counsel have extensive experience in complex litigation and are nationally known
18 leaders in the field of securities class actions.

19       **F.    Standing and Caliber of Opposition Counsel**

20       69.    Defendants are represented by top-notch defense firms that possess
21 substantial experience and expertise in the defense of complex securities litigation.
22 In the face of this formidable opposition, Lead Counsel developed their case with
23 an eye to full and complete resolution and recover to the Class, but which also had
24 the effect of persuading Defendants to settle the case on a basis favorable to the
25 Class before this Litigation progressed to more advanced stages.

26 **VII.  CONCLUSION**

27       70.    For the reasons set forth above and in the accompanying Memorandum
28 of Law in Support of Final Approval of Settlement and the Plan of Allocation and

Memorandum of Law in Support of Application for Award of Attorneys' Fees and Reimbursement of Expenses, Lead Counsel respectfully submit that: (a) the Settlement is fair, reasonable, and adequate and should be approved; and (b) the application for attorneys' fees and reimbursement of expenses should be granted.

 I declare under penalty of perjury that the foregoing is true and correct.

October 8, 2008       KAHN GAUTHIER SWICK, LLC


        BY: _Kim E. Miller_
          KIM E. MILLER
          12 E. 41st St., Ste. 1200
          New York, New York 10017
          Tel: (212) 696-3730
          Fax: (504) 455-1498
          E-mail: kim.miller@kgscounsel.com

[AMENDED] DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, AND THE AWARD OF ATTORNEY'S FEES AND EXPENSES